### UNITED STATES v. WRIGHT.
#### Cr. No. 4.

District Court, D. Delaware.

Jan. 27, 1943.

Judgment in accordance with opinion.

Talbot Smith, of Washington, D. C., Robert J. Callaghan, of Philadelphia, Pa., and David F. Anderson and Francis A. Reardon, both of Wilmington, Del., for Office of Price Administration.

Stewart Lynch, U. S. Atty., of Wilmington, Del., for the United States.

Joseph A. L. Errigo, of Wilmington, Del., for defendant.

LEAHY, District Judge.

Defendant was prosecuted for violations of Sec. 35(A) of The Criminal Code, 18 U.S.C.A. § 80, and Rationing Order No. 3, issued on April 21, 1942, by Leon Henderson, then Administrator of the Office of Price Administration. The source of the Price Administrator's authority to issue the rationing order is set out in the marginal note.[1]

The first count charged defendant with wilfully making a false statement in violation of Sec. 35(A) while registering for a ration book, in that he stated that he owned no sugar when, in fact, he owned 40 pounds; and under the second count he is charged with wilfully failing to declare his sugar supply in accordance with Rationing Order No. 3.

At trial, after the government rested, counsel for defendant asked that the jury be discharged and the court alone pass on the guilt or innocence of the defendant. The government agreed to this procedure. Counsel then moved[2] the court to find the defendant not guilty, regardless of the facts adduced by the government,[3] on the ground that, as the President had no constitutional right to enter the Executive Orders in question and the delegations of rationing by Congress were unconstitutional, no conviction could be sustained under Section 35(A) or Rationing Order No. 3.

I prefer to pass on defendant's guilt by considering the counts of the indictment in reverse order.

Count 2. Defendant argues there is no constitutional power in the President to promulgate executive orders which deal with "the consuming rights of the public"; and as the count is based on statutes giving the President power to act, as he has, by executive order such "action on the part of Congress constitutes a delegation of powers in violation of the Constitution." Defendant's voluminous brief commences with a studied analysis of McCulloch v. Maryland, 1819, 4 Wheat. 316, 4 L.Ed. 579, sweeps into a critique of a century of decisions of the Supreme Court, and comes to rest, finally, on Schecter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947.

The defense is: The sugar which defendant had in his possession was purchased from a local store, long after it had ceased to be a commodity in interstate commerce and before any federal statute or regulation could operate on it. Defendant claims he possesses the right to acquire, hold, and dispose of his sugar without the interferences of the present admin-

[1] On May 31, 1941, an amendment to an Act approved June 28, 1940 (54 Stat. 676; 41 U.S.C.A. preceding Section 1 note) became law and is known as the Priorities and Allocations Act (P.L. 89, 77th Cong., c. 157, 1st Sess., 55 Stat. 236, 41 U.S.C.A. preceding section 1 note). Under the Act, as amended, President created the office of O.P.M. (Ex. Order 8629, 6 F.R. 191) and within it the Office of Price Administration and Civilian Supply (Ex. Order 8734, 6 F. R. 1917) which later became O.P.A. (Ex. Order 8875, 6 F.R. 4483). Later, the President created the War Production Board (Ex. Order 9024, 7 F.R. 329) to which were transferred all the powers of O.P.M. (Ex. Order 9040, 7 F.R. 527). Pursuant to Directive No. 1, on January 24, 1942, W.P.B. granted to O.P.A. the authority to exercise the pow- ers and duties which had been conferred on the President by Congress with re-. spect to rationing (7 F.R. 562). After the Second War Powers Act, 50 U.S.C.A. Appendix § 631 et seq., the President, on April 7, 1942, ordered W.P.B. and O.P.A. specifically to proceed to ration (Ex. Order 9125, 7 F.R. 2719).

[2] Counsel stipulated that the jury should be discharged upon the condition that if defendant's motion should be overruled, the court was to decide defendant's guilt or innocence, without hearing further evidence.

[3] In effect, defendant demurred to the evidence. Such procedure is not irregular. United States v. Tatcher, 3 Cir., 131 F.2d 1002. Likewise, jury trial may be waived. Adams et al. v. United States ex rel. McCann, 63 S.Ct. 236, 87 L.Ed. ——.

istrators. He concludes his brief with a quotation from the words of a senator: "The people and the people alone may change the Constitution. Emergencies cannot do so * * *. I know it will be said that this delegation of power is for a limited time and is given to one in whom the people have great confidence. But the precedent which Franklin D. Roosevelt establishes will be claimed and enlarged upon by all his successors, whoever they may be. Precedents established by competent hands for desirable purposes are still precedents for incapable hands and undesirable purposes. * * *" [4]

But the defendant's real position, as far as I have been able to discover, is not to claim that the war power under Art. I, Sec. 8, Cls. 11–16, of the Constitution is subordinate to the commerce clause, for the war power is practically limitless (United States v. Macintosh, 283 U.S. 605, 51 S.Ct. 570, 75 L.Ed. 1302) to preserve the nation; what defendant is, in fact, attempting to do is to strike down the statutes upon which Rationing Order No. 3 is based on the doctrine of illegal delegation of legislative power.

It took until 1935 before a federal statute was condemned by the Supreme Court [5] on the theory of an unconstitutional delegation of legislative power. Uncertainties engendered by the 1935 decisions, as to the limits within which Congress might delegate, were explained by Currin v. Wallace, 306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441; and recently a series of cases have formulated tests to divine validity of legislative delegation. Mulford v. Smith, 307 U.S. 38, 59 S.Ct. 648, 83 L.Ed. 1092 (1939—involving tobacco marketing quota provisions of the Agricultural Adjustment Act of 1938); United States v. Rock Royal Co-Op., 307 U.S. 533, 59 S.Ct. 993, 83 L.Ed. 1446 (1939—Milk Marketing Provisions of the Agricultural Marketing Agreement Act of 1937); Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 60 S.Ct. 907, 84 L.Ed. 1263 (1940—regulatory provisions of the Bituminous Coal Act of 1937); and Opp Cotton Mills v. Administrator, 312 U.S. 126, 61 S.Ct. 524, 85 L.Ed. 624 (1941—Fair Labor Standards Act of 1938). With the question of delegation so fixed, I find that no court has ever attempted to strike down what Congress has determined to be appropriate to carry into effect its broad war powers under the Constitution.[6] In fact, the question of delegation has seldom, if ever, appeared in connection with a construction of the war power. In Hamilton v. Kentucky Distilleries & Warehouse Co., 251 U.S. 146, 40 S.Ct. 106, 111, 64 L.Ed. 194, the Supreme Court said: "* * * to Congress in the exercise of its powers, not least the war power, upon which the very life of the nation depends, a wide latitude of discretion must be accorded * * *." Earlier in Martin v. Mott, 12 Wheat. 19, 30, 6 L.Ed. 537, a 1795 statute was approved which authorized the President to employ the armed forces for the defense of the country against foreign attack and domestic disorder. Mr. Justice Story there wrote: "We are all of opinion, that the authority to decide whether the exigency

---

[4] Senator Borah, Senate Chamber, May 17, 1934, Cong.Rec., Vol. 78, p. 9011.

[5] Panama Refining Co. v. Ryan, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (the "Hot Oil" case); and Schecter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947 the NIRA "chicken case").

[6] Many peacetime statutes have been sustained which broadly delegate legislative authority in the interests of efficient government. See, e.g., Wayman v. Southard, 10 Wheat. 139, 6 L.Ed. 253 (where Chief Justice Marshall saw the need for flexibility in conforming the federal practice to the judicial systems of the several states, in interpreting a statute delegating to the federal judges power to change the rules of process as the judges "in their discretion, deem expedient."); Union Bridge Co. v. United States, 204 U.S. 364, 27 S.Ct. 367, 51 L.Ed. 523 (authorizing the Secretary of War to determine whether a bridge was an "unreasonable obstruction" to navigation); United States v. Grimaud, 220 U.S. 506, 31 S.Ct. 480, 55 L.Ed. 563 (authorization to the Secretary of Agriculture to "make such rules and regulations * * * as will insure the objects" of forest reservations); Avent v. United States, 266 U.S. 127, 45 S.Ct. 34, 69 L.Ed. 202 (authorization to the Interstate Commerce Commission to make rules in event of car shortage); Hampton, Jr., & Co. v. United States, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624 (authorizing the President to adjust tariff rates to correspond to differences in cost here and in foreign countries in view of everchanging conditions). The list of cases cited is, of course, far from complete.

has arisen, belongs exclusively to the president, and that his decision is conclusive upon all other persons. We think that this construction necessarily results from the nature of the power itself, and from the manifest object contemplated by the act of congress." McKinley v. United States, 249 U.S. 397, 39 S.Ct. 324, 63 L.Ed. 668, approved a delegation of authority to the Secretary of War "to do everything by him deemed necessary to suppress and prevent" prostitution "within such distance" of Army centers "as he may deem needful." Dakota Cent. Tel. Co. v. State of South Dakota, 250 U.S. 163, 39 S.Ct. 507, 508, 63 L.Ed. 910, 4 A.L.R. 1623, held valid a joint resolution of Congress authorizing the President to take over the telephone system of the country "whenever he shall deem it necessary for the national security or defense * * * and to operate [it] in such manner as may be needful or desirable * * *". United States v. Chemical Foundation, 272 U.S. 1, 47 S.Ct. 1, 471 L.Ed. 131, upheld the statute authorizing the sale of alien property by the Alien Property Custodian "under the supervision and direction of the President, and under such rules and regulations as the President shall prescribe." And, in United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 217, 81 L.Ed. 225, the delegation to the President of the power to prohibit the sale of arms to a country at war when he determined that such a prohibition would "contribute to the reestablishment of peace between" the countries engaged, was approved.

■ The Act, as amended, meets the proper tests in deciding the question of delegation: (1) The statute contains a clear statement of the policy and purpose which Congress seeks to accomplish; and (2) it contains an intelligible statement of the standards by which that purpose is to be worked out.

A reading of the Act under inquiry discloses its purpose, viz.: "to expedite the national defense", "to further expedite the prosecution of the war", "to establish priorities and allocate material", in order to ensure "the fulfillment of requirements for the defense of the United States". Who could ask for a clearer expression of purpose?

■ Manifestly, in the light of the authority of the cases cited, Congress need specify only within the limits of a reasonable practicability the means of carrying out the statute. Due to the needs, it would be irrational to demand of Congress a legislative formula to cover all contingencies of rationing and allocation. To ask Congress itself to enact a current and planned scheme is to ignore the function of the executive agencies, geared to deal with these complex problems. The first of these is to supply the military with food, clothing, heat, and transportation; and secondly, the allocation of materials to industry is essential to our defense. Under Lend-Lease [7] contributions must be made to our allies and friendly neutrals.

The needs of the native consumer are subordinate to these basic necessities.

In dealing with supply and demand for domestic purposes the executive is faced with highly complicated, technical and always changing problems. There are problems not only with respect to given articles, but also as to geographic differentiations. The Congress intended that these problems were to be solved by a *flexible* authority granted to the executive and his designated agents. The statement of the Supreme Court in Highland v. Russell Car & Snowplow Co., 279 U.S. 253, 49 S.Ct. 314, 316, 73 L.Ed. 688, is highly apposite: "It is everywhere recognized that the freedom of the people * * * in respect of their property and private affairs is a matter of great public concern and that such liberty may not lightly be impaired. * * * Under the Constitution and subject to the safeguards there set for the protection of life, liberty, and property * * *, the Congress and the President exert the war power of the nation, and they have wide discretion as to the means to be employed successfully to carry on. * * *"

■■ The requirement that each individual register for a War Ration Book is based upon subsections 2(a) (3) and 2(a) (8) of the Priorities and Allocations Act, as amended by Title III of the Second War Powers Act, 50 U.S.C.A.Appendix § 633.[8]

---

[7] Act of March 11, 1941, 55 Stat. 31, 22 U.S.C.A. § 411 et seq.

[8] Subsection 2(a) (3) provides: "The President shall be entitled to obtain such information from * * * any person * * *, as may be necessary or appropriate, in his discretion, to the enforcement or administration of the provisions of this subsection (a)." Subsection (a), of which the above provision is a part,

It is clear that Congress is entitled to secure protection against false statements,[9] while the act is being administered, by persons applying for war rations of scarce commodities. This principle was recognized in Kay v. United States, 303 U.S. 1, 58 S.Ct. 468, 82 L.Ed. 607.

The single issue here, then, is whether defendant has violated Rationing Order No. 3 (and the statutes under which it was issued) in that he wilfully failed to declare his sugar supply as required by Sec. 1407.-64(a) of the rationing order which provides: "Every individual registering and making application for a War Ration Book for himself * * * shall declare the facts required by OPA form No. R–301 (Application for War Ration Book) including such facts as may be necessary to determine whether the consumer for whom the application is made is entitled to a War Ration Book and the number of stamps to be contained therein * * *." Sec. 1407.203 provides: "Any violation of Rationing Order No. 3 is a crime punishable by a fine of not more than $10,000 or imprisonment of not more than one year, or both." This latter section is based on section 2(a) (5) of the Priorities and Allocations Act, as amended by Title III of the Second War Powers Act which (section 301(a) (5) 50 U.S.C.A.Appendix § 633 provides: "Any person who willfully performs any act prohibited, or willfully fails to perform any act required by, any provision of this subsection (a) or any rule, regulation, or order thereunder, whether heretofore or hereafter issued, shall be guilty of a misdemeanor, and shall, upon conviction, be fined not more than $10,000 or imprisoned for not more than one year, or both."

I find that the penal regulations of war rationing are not unconstitutional as an improper delegation of legislative power.

Other courts have held rationing regulations, promulgated under the Act, proper exercise of the "war powers" vested by Congress in the President or his nominees, and not in violation of the constitutional prohibitions against the taking of private property without "just compensation" or "due process of law". See, particularly, Harrison, J., in Henderson v. Bryan, D.C., 46 F.Supp. 682.

■ As the facts obviously showed defendant owned and possessed 40 pounds of sugar on May 4, 1942, and he failed to declare the same when he registered and completed OPA form No. R–301, he is guilty under Count 2 of the indictment.

Count 1. The government challenges defendant's right to attack the constitutionality of present rationing as a defense to Section 35(A) of the Criminal Code, 18 U.S.C.A. § 80, which makes it a crime for anyone to give "false or fraudulent statements * * * in any matter within the jurisdiction of any department or agency of the United States * * *". The government urges that a defendant cannot attack the constitutionality of a statute governing matters with respect to which the false statement is made. It has been held that he who attempts to obtain payments from the government by false representations is estopped to defend on the ground that the statute providing for such payments has been declared unconstitutional (United States v. Kapp, 302 U.S. 214, 58 S.Ct. 182, 82 L.Ed. 205, involving false statements made to the Secretary of Agriculture in order to secure benefit payments under the Agriculture Adjustment Act of 1933, 7 U.S.C.A. § 601 et seq. even though the Act had been held unconstitutional two years before in United States v. Butler, 297 U.S. 1, 56 S.Ct. 312, 80 L.Ed. 477, 102 A.L.R. 914).[10] I am not here concerned

---

confers rationing power on the President, viz., subsection 2(a) (2).

Subsection 2(a) (8) provides: "The President may exercise any power, authority, or discretion conferred on him by this subsection (a), through such department, agency, or officer of the Government as he may direct and in conformity with any rules or regulations which he may prescribe."

[9] Legislative history indicates the purpose of Title III of the Second War Powers Act, amending the Priorities and Allocations Act, was to increase investigative and informational powers. See, e. g., Second War Powers Act, 77th Cong.,

2nd Sess., Senate Rep. No. 989; id. House Rep. No. 1765; Priorities and Allocations Act, 77th Cong., 1st Sess., Senate Rep. No. 309; id., House Rep. No. 460.

[10] The rule of Kapp case has been applied in analogous situations; Kay v. United States, 303 U.S. 1, 58 S.Ct. 468, 82 L.Ed. 607; United States v. Hautau, D.C., 43 F.Supp. 507; Boehm v. United States, 8 Cir., 123 F.2d 791; Hills v. United States, 9 Cir., 97 F.2d 710; and cf., Carter v. State of Texas, 305 U.S. 557, 59 S.Ct. 71, 83 L.Ed. 351, affirming 135 Tex.Cr.R. 457, 116 S.W.2d 371.

with an attempt on the part of defendant to obtain fraudulently from the government a monetary payment. True, the War Ration Book sought and illegally acquired by defendant may have a value beyond monetary standards, but, having found that sugar rationing involves no unconstitutional delegation of legislative war power, the proposition of the government that defendant cannot raise the constitutional question as a defense to Section 35(A) of the Criminal Code becomes moot.

Thus, it appears defendant has no defense for violating Section 35(A) in that he did—as I find the facts—give a false statement in a matter within the jurisdiction of a department of the United States.

The United States Attorney should move for immediate sentence under both counts.